WILLIAM POST and wife *vs.* JEHIEL J. POST, SUSAN
LEGGET and others.

A testator, by his will, executed before the Revised Statutes, devised as follows:
"After the decease of my wife, all the overplus of my real estate of what
kind soever, I devise unto my three children, W., G. and M., to be divided,
&c. and *after their decease* to go *unto their legal heirs,*" &c. After a devise to
M. and "*unto her heirs,*" of a lot in Front street, and a lot in Pearl street,
and half of another lot in Pearl street occupied by T. S., the words of the
will were: " I devise unto my two sons, W. and G., and *unto their heirs,* to be
equally divided between them, one half of my house and lot of ground in
Pearl street, as the same is now divided, occupied by T. S." &c. In subse-
quent parts of the will were these clauses: "After the decease of my wife,
all the real estate not herein specified, and all the real estate purchased with
the money of my personal estate, I devise unto my sons, W. and G. and
unto *their heirs,* to be equally divided between them." Again: "After my
real and personal estate shall be so respectively divided, it shall be *held* by
my aforesaid children, during his, her or their natural lives, respectively, and
upon his, her or their several decease, shall go to his, her or their heirs
forever."
*Held* that the words of devise were clearly within the rule in *Shelley's Case;* that
taking the whole will into consideration, no such manifest intention of the
testator could be discovered as to demand that the rule in that case should
give way to it; and that the sons, W. and G. took, on the death of the testa-
tor's wife, under the will, estates in fee in the real estates devised to them,
and not life estates with remainders in fee to their children.

THIS action was commenced for the partition of certain
real estate situated in the city of New York, among the
heirs of William Post, the common ancestor, who died in
1804. The said William Post left a will, dated July 21,
1803, which was duly proved July 21, 1804. By this will,
the premises in question were devised to the testator's two
sons, William Post and Gerardus Post, as tenants in common.
After a devise to his two sons of certain wild and unim-
proved lands, subject to the dower therein of his widow, the
will proceeds as follows :

" I will and declare that no part of the remainder of my
real estate be sold ; after the decease of my wife all the over-
plus of my real estate, of what kind soever, I devise unto
my three children, William Post, Gerardus Post and Mary

Jaggar, the wife of Jehiel Jaggar, to be divided in the manner hereinafter specified, and after their decease to go unto their legal heirs; and in case any or either of my said children shall die without lawful issue, then his or her or their part or parts, share or shares, shall be equally divided among my surviving children; but in case any or either of them shall die leaving lawful issue, then the part or parts, share or shares which such of my said children or child would have inherited, shall make a share or part, or shares or parts for his or her or their child or children.

I give and bequeath unto my aforesaid daughter, Mary Jaggar, and unto her heirs, my house and lot of ground in Front street, &c.; also my house and lot of ground as it now is divided, occupied by Thomas Clark, in Pearl street, &c.; also I give and bequeath unto my aforesaid daughter, Mary Jaggar, and unto her heirs, one half of my house and lot of ground in Pearl street, as the ground is now divided, occupied by Thomas Service, and purchased also from Robert Pettit. I devise unto my two sons, William Post and Gerardus Post, and unto their heirs, to be equally divided between them, one half of the house and lot of ground in Pearl street, as the ground now is divided, occupied by Thomas Service, also purchased from Robert Pettit."

The testator, by a similar clause, directs: "After my real and personal estate shall be so respectively divided, it shall be held by my aforesaid children during his, her or their natural lives respectively, and upon his, her or their several decease shall go to his, her or their legal heirs."

The property given to William and Gerardus was held in common during their lives, and was never divided. Gerardus died October 22, 1833, leaving a will, in and by which he divided his real estate into five parts, and devised one of such parts to each of his three sons, and the two remaining parts he devised to his executors, in trust to apply the rents and income and profits of one of such parts to the use and benefit of each of his daughters, during life, and after her

death to convey the said one fifth part to her lawful issue. Susan, one of these daughters, married Edward W. Leggett, now deceased, and had eight children, all parties to this action, six of them being infants and represented by their guardian.  Mary, the other daughter, married William T. Barber, and she, her husband and children were likewise parties to the action. Caleb S. Woodhull, the executor named in the will, qualified, and letters testamentary were issued to him by the surrogate of New York, December, 1833.  The Court of Appeals, in *Leggett* v. *Perkins*, (2 *Comst.* 297,) where the will is set out and its construction was under consideration, decided that the legal estate was vested in the executor, as trustee under the will.  Woodhull continued to act as trustee until March, 1850, when, in pursuance of an order of the Supreme Court, he transferred all the trust estate to William H. Leggett, who was by said order substituted as trustee in his place.  William H. Leggett continued to act as trustee during his life, and at his death Henry W. Eastman was appointed trustee, by an order of the Supreme Court made in February, 1864.  Woodhull and his successors in office have at all times since the death of the testator in 1833, and until the sale in this action in April, 1866, retained the possession of the premises, collected the rents, &c. and applied them to the use and benefit of Mrs. Leggett and her sister, Mrs. Barber.  Until the motion on which the order appealed from was made, the fact that Gerardus Post, the testator, owned the lands in fee, and that the executor took an estate in fee in the lands, has never seriously been questioned, but all parties have acted on the theory that they took a fee.  The complaint herein alleged, and the referee on the reference as to title found, that the said premises were owned by the said William Post and Gerardus Post, in fee, and that under the will of the latter the executors therein named acquired the legal estate to two fifths of the same, and held one fifth thereof in trust for Mrs. Leggett and her children, and the other fifth in trust for Mrs.

Barber and her children. The judgment in the action adjudged that one tenth of the net proceeds of the sale of the premises, amounting to $9792.17, be paid to Henry W. Eastman, as trustee for Mrs. Leggett, and that another tenth thereof be paid to said Eastman, as trustee for Mrs. Barber.

Subsequent to the sale and the conveyance of the property by the referee, Mrs. Leggett made a motion, at special term, that the referee be directed to pay over the said one tenth part to her, instead of to the said Eastman as trustee; and on such application, the court decided that, under the will of William Post, his two sons, William and Gerardus, took a life estate, and that Mrs. Leggett was entitled to one tenth of the proceeds, in her own right, under said will.

. From this order appeals were taken by the trustee, by the guardian of the infant children of Mrs. Leggett, by Edward W. Leggett, an adult child, and by the plaintiff. Two questions arose on this appeal:

1. Whether Mrs. Leggett was, under the circumstances, entitled to make the application, and whether the court had the power to make, or was justified in making, an adjudication upon the title, in the present proceeding.

2. If so, then whether William and Gerardus Post took an estate in fee under the will of William Post, deceased; or whether they took a mere life estate, with remainder to their children.

*John E. Burrill*, for the appellants. I. The order appealed from, in effect, reverses the judgment made in the action, by which the rights and interests of the applicant and all other parties to the action were adjudicated. The court ought not, under the circumstances, to have sustained the application, or undertaken, in this summary and collateral manner, to determine a question involving the construction of the will.

II. The trustee, under the will of Gerardus Post, has for for more than thirty years been in possession of the premises,

claiming the legal estate therein, and applying the rents and profits thereof to the use and benefit of Mrs. Leggett; and she has during all that time recognized and acquiesced in the title of such trustee.    Under such circumstances the application should not have been granted, even if the construction put upon the will by the court was correct.        ₁

III.  The devise in question is within the rule in Shelley's case, and under it William Post and Gerardus Post, the father and uncle of Mrs. Leggett, took a fee in the premises in question.  (4 *Kent's Com.* 215.  *Schoonmaker* v. *Sheely,* 3 *Hill,* 165.  *S. C. on error,* 3 *Denio,* 485.)   1.  Chancellor Kent states that "whatever may have been the original cause and true policy of the rule, it has been firmly established as an axiom of the English law of real property for nearly five hundred years," and "that the rule, according to the English view of it, was considered, in *Brant* v. *Gelston,* to be of binding authority in New York, and so continued to be until the revision of the statutes in 1830.  (4 *Kent's Com.* 218, 232.  *Brant* v. *Gelston,* 2 *John. Cas.* 384.)   2.  The rule is stated to be, "that when the ancestor, by any gift or conveyance, takes an estate of freehold, and in the same gift or conveyance an estate is limited mediately or immediately to his heirs in fee or in tail, *the heirs* are words of *limitation* of the estate, and not words of purchase."  (4 *Kent's Com.* 218.   3 *Denio,* 485, *supra.*)   3. The language of the will in question is clearly within the rule : "All the overplus of my real estate, of what kind soever, I devise unto my three children, William Post, Gerardus Post and Mary Jaggar, to be divided in the manner hereinafter specified, and after their decease, to go unto their legal heirs."   Again : "After my real and personal estate shall be so respectively divided, it shall be held by my aforesaid children during his, her or their natural lives, respectively, and upon his, her or their several decease, shall go to his, her or their legal heirs forever."  (*See cases above cited.   6 Cruise Dig. ch.* 14, *p.* 300.   *Id. p.* 362, §§ 73, 74, 75.)

IV. The principle at one time contended for in England, that the legal operation of the words used should yield to the intent of the testator, so that where, on the face of the will, the intent of the testator was manifest that the ancestor should take a mere life estate, the intention should govern, although the legal operation of the words used created a fee, never was established in England or this state. 1. The decision of Lord Hardwicke in *Bagshaw* v. *Spencer*, (1 *Vesey*, 142,) has, in the language of Chancellor Kent, "been severely questioned and permanently overruled, by Lord Northington in *Wright* v. *Pearson*, and by Lord Thurlow in *Jones* v. *Morgan*." (4 *Kent's Com.* [220,] 230.) 2. The decision of the King's Bench, in *Perrin* v. *Blake*, was, on error to the Exchequer Chamber, reversed by a large majority of the judges; and as Chancellor Kent states, "The result of that famous controversy tended to confirm, by the weight of judicial authority at Westminster Hall, the irresistible pre-eminence of the rule, so that even *the testator's manifest intent could not control the legal operation of the words used.*" (4 *Kent's Com.* [222,] 232.) Again, he says: "It is now generally admitted that the decision in the case of *Perrin* v. *Blake* was directly contrary to the stream of authorities on the same subject, and * * * convenience and policy equally indicate an adherence to the old and established rule." (4 *Kent's Com.* [227,] 237. 3 *Denio*, 497.) 3. Jarman says: "Words, however positive and unequivocal, expressly negativing the continuance of the ancestor's estate beyond the period of its express limitation, will not exclude the rule, for this intention is as clearly indicated by the mere limitation of a life estate as it can be by any additional expression; and the doctrine, let it be remembered, is a rule of tenure which is not only independent of, *but generally operates to subvert the intention.*" Again: "As no declaration, the most positive and unequivocal, that the ancestor shall take, only, or his estate be subject to the incidents of a life estate, so a declaration that the heirs shall take as purchasers is equally

inoperative to have such effect." (2 *Jarman on Wills*, 243, *and cases cited.* 1 *Prest. on Estate*, 365, 366. *Also*, 3 *Hill*, 166, *where the language from Preston is abstracted.*) See also, *Jones* v. *Morgan*, where the court said : " I think the argument immaterial, that he (testator) meant the first estate to be an estate for life. I take it that in all cases (within the rule) the testator does mean so." (1 *Bro. Ch. Cases*, 205, 216, 219.) 4. The only subject in reference to which the intention of the testator, as disclosed by the will is considered, is the determination of who are meant by the word "heirs." In *Jones* v. *Morgan*, (*supra*,) it is said : " I take the rule in *Shelley's case* never to have been shaken at all. I take that rule to be, that where the heir takes in the character of heir, he must take in the quality of heir. I never heard it contended that the testator could vary the sense of the law. * * * I take the question always to have been as to the import of the word 'heir.' (219.) Where the estate is so given that after the limitation to the first taker it is to go to every person who can claim as heir to the first taker, the word 'heirs' must be a word of limitation. * * * If he meant that every person who should be heir should take, he then meant what the law would not suffer him to give, or the heir to take, as purchaser." (1 *Bro. Ch. Cases*, 205, 216, 219. 2 *Jarman on Wills*, 243. *Schoonmaker* v. *Sheely*, 3 *Hill*, 166. *S. C.* 3 *Denio*, 485.) 5. The cases relied upon by the other side are considered in the two cases last cited, (3 *Hill*, 166 ; 3 *Denio*, 485 ;) and will be found to be cases where the words " heirs," or " heirs of the body," were not used, and for that reason they were not within the rule in *Shelley's case*, or where the court construed the words used, to designate some other class of persons less extensive than heirs generally. (2 *Jarman on Wills*, 243, 271. 3 *Denio*, 490, *per Chancellor. Id.* 497, *opinion by Hand.*)

V. Conceding that the will discloses an intention on the part of the testator, that the sons should take a mere life estate, (which is not admitted,) still there is nothing in the

will to limit or restrict the meaning or effect of the words "heirs or lawful heirs ;" or to show that the testator did not intend thereby to include all those who should stand in that relation at the time of the death of the sons ; and the devise comes strictly within the rule.   (2 *Jarman on Wills*, 246, 247.   1 *Preston on Estates*, 365.   3 *Hill*, 167.)

VI. The scheme of distribution as disclosed by the will was, 1. That none of the real and personal estate should be disposed of until the death of his wife.   The surplus personal estate was to be invested in the purchase of real estate, if possible.   2. During the life of the widow, the rents, income and profits of all the personal and real estate, including that purchased by the executors, should be divided as follows :   one third to the widow, and the remaining two thirds between the three children.   3. At the death of the widow, all the real estate was to be divided in the manner specified in the will; certain specific parcels to Mrs. Jaggar, other specific parcels to the two sons, and the residue of real and personal also to the two sons.   4. If, at the time of distribution, to wit, the death of the widow, either of the children should have died, leaving issue, the share of the deceased child to go to the issue ; if there should be no issue, then the share of the deceased child should go to the surviving children and their heirs.   The clause at folio 18 evidently refers to the death of the wife, or perhaps to the death of the testator.   In either case the result is the same.   5. The portions which the several children should take, under the will, were to be taken in fee.   6. The provision in favor of the widow or widower of a deceased child, evidently refers to death before that of the testator.   Whether the interest of the "widower or widow" of the deceased child ceases at the time of the division of the estate, or continues to the death of such widower or widow, in either case it does not affect the devise, but merely gives to the widow or widower a right to *one third* of the rents and income of the share of the husband or wife.

VII. The two sons of the testator took a fee under the

clause which is in these words : " And after the decease of my wife, all the real estate not herein specified, and all the real estate purchased with the money of my personal estate, I devise unto my sons, William and Gerardus, and unto their heirs, to be equally divided between them." 1. The evident intention was that the daughter should have no interest in any of the real estate except that specifically given to her, but that all the rest should go to the sons in fee. 2. The words used being such as to create a fee absolute in the two sons, all other clauses or provisions attempting to restrict or limit their control and right of disposition of the property must be rejected, on the ground of repugnancy or surplusage.

VIII. The provisions last above referred to are in harmony with the remainder of the last clause of the will, and show that the intention of the testator was that the sons should take a fee, and the legal effect of the words used is in accordance with such intention.

*Chas. A. Rapallo,* for Susan Leggett. I. The whole will must be taken together, and one part explained by another ; and the general terms employed in some parts of the will must be controlled by the clauses which define with more particularity the intentions of the testator.

II. The intentions of the testator, as gathered from the whole will, appear clearly to have been as follows : *First.* As to the estate that his children should take. That during the lifetime of his wife the rents of his real and personal estate should be divided between his widow and three children — one third to the widow, and two thirds to the three children. That no part of his real estate should be sold, but that after the death of his wife it should be divided into shares, as directed by the will, viz : the share of his daughter, Mrs. Jaggar, to consist of a lot in Front street, a lot in Pearl street, and half of another lot in Pearl street, and the residue of the real and the personal estate to constitute the share of

his sons, Gerardus and William.   That the personal estate should be converted into real, so far as practicable, and the part not so converted should be securely invested.   The will then expressly directs that after the estate is so divided "it shall be held by my aforesaid children during his, her or their natural lives, respectively."   The children are to have a power to lease within specified limits, and the rent and income of the real and personal estate is directed to be paid quarterly, half yearly or yearly, as may be judged most proper.   (This provision shows that although the testator speaks of the property as being given to the children, yet he intends that the rents and income, merely, shall be divided among them at such stated periods as may be judged most proper.)   The intention of the testator that his children should, at most, have but a life estate, and that they should have no power of disposition of the fee of the real estate or of the principal of the personal, is clearly apparent from the following clauses: 1st. The clause which prohibits the sale of any part of the real estate after the death of the testator's wife.   2d. The clause which declares that after the division the children are to hold during their natural lives.   3d. The clause which declares that nothing in the will contained "shall vest a right in either of his children to sell or dispose of his, her or their income, or profits of his real or personal estate, for a time to exceed one year."   4th. The power to lease, given to the children.   5th. The clause directing that the personal estate, not invested in land, shall be put out on security to secure the principal for the legal heirs.   These clauses control the general expressions in other parts of the will, devising the real and personal estate to the testator's sons, William and Gerardus, and their heirs.   *Secondly.* As to the remainder in fee.   In various parts of the will the testator declares that after the decease of his children, the estate is to go to their heirs.   But in other parts he defines more specifically how it shall be disposed of.   1st. If any or either of the children die without lawful issue, his, her or their share or

shares shall be equally divided among the surviving children. 2d. In case any or either of them die leaving lawful issue, the part or parts, or share or shares which such children or child would have inherited, is to go to "his, her, or their child or children." 3d. If either of them leave a husband or wife him surviving, such husband or wife is to have one third of the income during "his or her widowhood." These specific directions control the general term "heirs," as used in this will, and create remainders upon the life estates of the testator's children, by virtue of which the children of those children take as purchasers and not by descent. The rule in *Shelley's case* is not applicable to this devise. The devise is, in substance, to the testator's three children for life, and after their death to their children ; and in default of issue, to the survivors of the testator's children. (*Rogers* v. *Rogers*, 3 *Wend.* 503. *Findley* v. *Riddle*, 3 *Binney*, 139.) *The* whole will must be taken together, and one part explained by another, and if by "*heirs of the body*," children, or first and other sons, are seen to be intended, the will is expounded as if heirs of the body were erased, and children inserted, (Per Lord Mansfield, 2 *Burr.* 1100.)

III. When the rule in *Shelley's case* is invoked, there is latitude of construction allowed in the case of wills, in furtherance of the testator's intention ; and the rule seems to have been considered as of more absolute control in its application to deeds. (4 *Kent's Com.* 216.) It has long been settled in England and this country, that the rule in *Shelley's case*, when attempted to be applied to devises, must give way to the plain and manifest intention of the devisor ; and by a devise to a man's heirs, or the heirs of his body, they may take as purchasers whenever the intent of the testator is clear and manifest. This is conceded by Sir W. Blackstone, in the case of *Perrin* v. *Blake*, hereafter referred to. (*Harg. Law Tr.* 502, 503, 507. *See also Striker* v. *Mott*, 28 *N. Y. Rep.* 91; *Denio, J.*) "The rule in *Shelley's case* was originally introduced in favor of the lord, to prevent his being

deprived of the fruits of the tenure, and, likewise for the sake of specialty creditors. The reason of the rule has long since ceased; yet having become a rule of property, it is adhered to in all cases *literally* within it, though the reason has ceased. But when there are circumstances which take the case out of the letter of this rule, *it is departed from in favor of intention,* because the reason for the rule has ceased." (*Doe* v. *Lansing,* 2 *Burr.* 1107. *Findley* v. *Riddle,* 3 *Binney,* 154.)

IV. These are circumstances which take this case out of the letter of the rule, viz: 1. The remainder in fee, when the whole will is construed together, appears to be given, not to the heirs generally of the first taker, but to his children, if he leave any, and in default of children to his surviving brother and sister. Under such a devise, the first taker has only a life estate, and his children take by purchase. "A devise to A, and after his decease to his children gives only a life estate to A." (*Wild's case,* 6 *Co.* 17.) Where the devise was to A, for life, and after his decease to the children of his body, with an habendum to the heirs of the body, the Court of Errors, in furtherance of the testator's intention, construed the word *heirs,* in the habendum, as words of purchase, and decided that A took a life estate only, with remainder in fee to his children. (*Rogers* v. *Rogers,* 3 *Wend.* 503.) A devise " to A, during life, and after his decease, if he shall die leaving lawful issue, to his *heirs* as tenants in common and their respective heirs and assigns forever; but *in case he should die without leaving lawful issue,* then to B, the brother of A," is only an estate for life in A. (*Findley* v. *Riddle,* 3 *Binney,* 139.) 2. The direction that in case of the death of either of the testator's children, his or her husband or wife shall take an estate in one third of the share of such child, *during his or her widowhood,* prevents the rule in *Shelley's case* from operating. To bring a case within the rule, the remainder must be limited to the heirs or heirs of the body of the first taker, so as to comprehend the whole class, and to cause them to become entitled in the same man-

ner and to the same extent as if the grant had been to A and his heirs, or to A and the heirs of his body. If other words are added, causing the parties who are designated as heirs to take a different or greater or less estate, or in any other manner than they would take by descent as heirs of the first taker, then they must necessarily take as purchasers. (*See Findlay* v. *Riddle, supra.*) By this devise the children or "heirs," so called, of the testator's children, take a more beneficial estate by the terms of his will than they would take simply as heirs of their parents; for if Mrs. Jaggar, for instance, was seized in fee and died leaving children and a husband, her children, if they took by descent, would have taken subject to an estate of their father in the whole property during his life; whereas, if they take by devise or purchase under this will, he has but one third, and this only so long as he remains a widower; and if Gerardus Post died leaving a widow; if he were seised in fee, and his children took by descent, his widow would have had her dower during life, whereas by the will it is restricted to her widowhood. Therefore the rule in *Shelley's case* can not be applied without, in certain contingencies, subjecting the estates of the remaindermen to burthens from which the terms of the will relieve them. The intentions of the testator can not therefore be carried out, unless the representatives of the testator's children take as purchasers. (*See Rogers* v. *Rogers,* 3, *Wend.* 503.)

V. The express declarations of the testator, *that no part of his real estate shall be sold,* and that *nothing in the will contained shall vest a right in either of his children to sell or dispose of his, her or their income or profits,* &c. prevent the application of the rule in *Shelley's case,* which would give to the children the fee simple, and absolute and unrestricted power of alienation. The testator's intention must prevail, even if in other respects this were a case to which the rule could apply. (*Perrin* v. *Blake. Rogers* v. *Rogers,* 3 *Wend.* 519, 522, 524, 527.) The case of *Perrin* v. *Blake*

was in all respects within the rule, so far as relates to the language of the devise ; but the testator in the same will declared it to be his intention that his devisees should not sell his estate for a longer period than their own lives. The court of King's Bench held that this declared intention prevented the application of the rule in *Shelley's case*, and that the first taker took only a life estate. This decision was reversed in the Court of Exchequer Chamber, and an appeal afterwards taken to the House of Lords, but it was never decided there, the case having been compromised pending the appeal, so that the decision of the King's Bench has never been passed upon by the court of last resort in England. Burrow, in his reports, omits the opinions, regarding the point as still undecided. But the court of last resort in this state, in the case of *Rogers* v. *Rogers*, (2 *Wend.* 510,) cite the decision of the King's Bench with approbation, and give judgment according to the intention of the testator as gathered from the whole will. The leading opinion in the case in the exchequer, seems to turn upon the very nice distinction, that the question of intent turns not on the quantity of estate intended to be given to the ancestor, but what was the nature of the estate intended to be given to the heir. But this distinction does not appear to be approved by the Court of Errors in *Rogers* v. *Rogers*, and is there shown to be inconsistent with the general course of the authorities. The decision of the King's Bench, in *Perrin* v. *Blake*, seems to accord with the doctrine of the Court of Errors. (*See opin. of Marcy, J.* 3 *Wend. pp.* 522, 523, 524, 527, 528.)

VI. The devise of the lands in Montgomery county to William and Gerardus for their own use and benefit forever, which immediately precedes the disposition of the residue of the testator's real estate, shows clearly that the testator intended to give to his sons the fee simple in one case and not in the other, and brings this case precisely within that of *Rogers* v. *Rogers*, (3 *Wend. opin. of Savage, Ch. J. p.* 514; *opin. of Marcy, J. p.* 527. *See note to page* 514.) "It is

Post *v.* Post.

placed beyond a reasonable doubt, by the different phrase-
ology used in the two devises, that the testator meant to give
an estate to his son James different from that which Thomas
was to take ; yet if the word children is to be taken as synon-
ymous with heirs, the kind of estate given by each will be
the same.    This striking difference of language, in a matter
where uniformity of intention generally begets uniformity of
language, can only be ascribed to a difference of intention."
(*Marcy, J. p.* 527.)    This also shows clearly that the Court
of Errors did not adopt the distinction taken by Blackstone,
J. in *Perrin* v. *Blake,* but in fact regarded the quantity of
estate intended to be given to the first taker as determining
whether the heirs took by purchase or by descent.    The Eng-
lish judges, in the case of *Perrin* v. *Blake,* stood five (that
is, three in the King's Bench and two in the Exchequer,) in
favor of giving effect to the intention of the testator, either
in respect to the quantity of estate intended to be given to the
first taker, or the nature of the title by which the heir should
take, against seven (one in the King's Bench and six in the
Exchequer) who refused to give effect to such intention — a
portion of the majority being opposed to giving effect to the
intention of the testator in either respect.    All the opinions
of the English judges against allowing the intention of the
testator to prevail, and the dicta of the best writers founded
on those opinions, are disapproved in the cases of *Rogers* v.
*Rogers,* and *Findlay* v. *Riddle,* cited above ; and the law of
this state is established in favor of the testator's intention.
The order should be affirmed.

SUTHERLAND, J.    It is evident that the testator (William
Post, the elder,) drew his own will.    It is probable that he
had never heard of the rule in *Shelley's case;* and it is evi-
dent that he had no idea of any difference between gifts of
personal and of real property.

There is really no devise of his real estate during the life
of his wife, except perhaps of the unsettled lands in Mont-

gomery county ; unless the devise of the rents and profits thereof during the life of his wife should be. considered as a devise of real estate itself during her life.

It is probable that the testator thought that his executors and executrixes would take his real as well as personal estate during the life of his wife, and could and would carry out his directions and intention as to the division of the rents and profits thereof during the life of his wife, without any express devise thereof to them during the life of his wife.

It is entirely immaterial now, as the wife is dead, whether the court, in her lifetime, would have implied a devise to the executors and executrixes in trust until her death, or would have considered the devise of the rents and profits, until that event, the same as a devise of the land itself.

The question now and in this case is, whether the testator's sons, William and Gerardus, had or took, on the death of the testator's wife, under the will, estates in fee or life estates with remainders in fee to their children.

The words of devise are clearly within the rule in *Shelley's case.* The words are : "After the decease of my wife, all the overplus of my real estate, of what kind soever, I devise unto my three children, William Post, Gerardus Post, and Mary Jaggar, to be divided, &c., and after *their decease, to go unto their legal heirs,*" &c.

Again : after a devise to Mary Jaggar, and "*unto her heirs,*" of a lot in Front street, and a lot in Pearl street and half of another lot in Pearl street occupied by Thomas Service, the words of the will are : " I devise unto my two sons, William Post and Gerardus Post, and *unto their heirs,* one half of my house and lot of ground in Pearl street, as the same now is divided, occupied by Thomas Service," &c.

In a subsequent part of the will the testator says : "And after the decease of my wife, all the real estate not herein specified, and all the real estate purchased with the money of my personal estate, I devise unto my sons, William and

Gerardus Post, and unto *their heirs,* to be equally divided between them."

In a subsequent part of the will we find these words: "After my real and personal estate shall be so respectively divided, it shall be *held* by my aforesaid children, during his her or their natural lives, respectively; and upon his, her or their several decease, shall go to his, her or their heirs forever."

It would be difficult, I think, to state or word a devise more clearly within the rule in *Shelley's case,* than the devise to the children, or to the testator's sons, William and Gerardus, after or upon the death of the testator's wife. In the first place there is a direct devise to Mary Jaggar, and to his sons, William and Gerardus, in apt and proper words to give them estates in fee simple, absolute; and there might be a question whether the clause of the will last quoted, in which the wish or direction is expressed, that the real and personal estate " shall be *held* by my aforesaid children during his, her or their natural lives, respectively," and then go to his, her or their legal heirs, even independent of the rule in *Shelley's case,* would be considered as repugnant to, or inconsistent with, the absolute fees previously given; but it is not necessary to consider this question, for it is clear that there is nothing in this clause which takes the devise out of the rule in *Shelley's case* ; indeed that it is this clause, mainly, which gives any occasion or opportunity for the application of the rule in *Shelley's case,* in construing the will.

As to the provision in favor of the widow or widower of a deceased child, out of the income, &c., it may refer to the death of a child before the death of the testator, or during the life of his wife ; but if otherwise, I do not see how it can affect the devise to the children, or the question as to the nature or *quantity* of the estate they took.

As to the clause giving a child having no lawful issue a right to let his or her part for a term of years, &c. ; and as to another clause, declaring that nothing contained in the

Post *v.* Post.

will shall give either child a right to sell or dispose of his, her or their *income* or *profits*, &c. for a time to exceed one year ; so far as these clauses were intended or may be received as restrictions on the right or power of sale or disposition incident to the absolute estates in fee given to the children, they must be received as repugnant to the primary devise of such estates, and as of no force or effect.   It is a rule of construction that a secondary intention, inconsistent with the primary intention, must yield to such primary intention.   But I have some doubt whether the clauses last referred to were not intended to apply only during the life of the testator's wife.

I think the order at special term appealed from should be reversed ; that the one tenth of the proceeds of the sale should be paid, not to Mrs. Leggett, but to Mr. Eastman, the trustee, according to the judgment in this action ; and that the trustee should be allowed a reasonable sum for his costs and expenses in protecting his right to the trust fund.

CLERKE, J.   The language employed by Chief Justice Savage, in *Rogers* v. *Rogers*, (3 *Wend.* 511,) borrowed in a great measure from the opinion of Mr. Justice Blackstone, in the Exchequer Chamber, in *Perrin* v. *Blake*, (*Harg. Tr.* 487,) is peculiarly applicable to the present case.   He says : " The rule in *Shelley's case* is, that when the ancestor takes an estate of freehold, with remainder to his heirs, or heirs of his body, the word heirs is a word of limitation of the estate, and not of purchase ; that is, in other words, that such remainder vests in the ancestor himself, and the heir, when he takes, shall take by descent from him, and not as a purchaser."   Of course he meant that the remainder should be given or limited in the same instrument in which the particular estate is given.   "This rule," he proceeds, "may give way to the manifest intention of the testator, provided that intent be so fully expressed as to leave no doubt whether it was his intent or not."   This was fully conceded by Mr. Justice

Blackstone in *Perrin* v. *Blake ;* and in that case, while he did not doubt that the testator intended to give to his son only an estate for life, it was not at all clear what estate he intended to give to his son's heirs, and in what way. If it is not certain, beyond the possibility of doubt, that he had a positive intention upon this point, it was held that the general rule of law must prevail ; and the heirs must take by descent and not by purchase. They can not take as purchasers, unless it is affirmatively shown that he so intended. It was held that the restriction upon the son's power of disposition did not sufficiently indicate that his heirs should take by purchase; and, accordingly, the decision in the King's Bench, which created so much surprise, at the time, in the profession, was reversed in the Exchequer Chamber, by the opinion of seven judges against one.

In the case before us, it is still more dubious that the testator intended that the heirs of his son (Gerardus Post) should take by purchase. To be sure, he devises, after the decease of his wife, all the overplus of his real estate to his three children, (of whom Gerardus was one,) and after their decease, to his legal heirs ; and, in a subsequent clause, directs, after his real and personal estate shall be divided, that it shall be held by his aforesaid children during his, her or their natural lives, respectively ; and upon his, her or their several decease, shall go to his, her or their legal heirs. But, in referring to the particular property in question, he devises unto his two sons, (one of whom was Gerardus,) and unto their heirs, one half of the house and lot of ground in Pearl street, &c. ; thus, as far as this clause is concerned, giving them, indisputably, an estate of inheritance. So that, taking the whole will into consideration, no such manifest intention of the testator can be discovered as to demand that the rule in *Shelley's case* should give way to it. In the case already referred to, (*Rogers* v. *Rogers*, 3 *Wend.* 511,) and on which the counsel of S. Leggett seems to place great reliance, the testator gave to his son, for and during his natural life, and

to *the children* of his body, lawfully begotten, after his decease, all that certain, &c. describing the premises, to have and to hold the said premises unto his said son for and during his natural life, and after his decease to the *heirs of his body,* &c.

It has always been held that the rule in *Shelley's case* does not apply where the words children, issue, sons, &c. are used instead of heirs; and accordingly, it was held in *Rogers* v. *Rogers* that the employment of the word "*children,*" in the premises of the devise, took it out of the rule, and that the words "*heirs of his body,*" in the habendum, were used by the testator to designate the persons named in the premises.

No other word than "heirs" is used in the will before us, applicable to the quantity of interest, in the estate.

I concur with Justice Sutherland in thinking that the order of the special term should be reversed.

GEO. G. BARNARD, P. J. also concurred.

Order reversed.

[NEW YORK GENERAL TERM, June 4, 1866. *Geo. G. Barnard, Clerke* and *Sutherland,* Justices.]